UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARQUITA STANTON,

Plaintiff(s),

Case No.  22-cv-13072

vs.

HON. GERSHWIN A. DRAIN

CITY OF DETROIT,

Defendant(s).

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#25]

## I.    INTRODUCTION

The instant action arises out of Plaintiff's employment with the City of Detroit's Office of the Chief Investigators.  Plaintiff has asserted a hostile work environment claims under Title VII[1] and the Michigan Elliott-Larsen Civil Rights Act, as well as disability discrimination claims under the ADA, the Rehabilitation Act and Michigan's Persons with Disabilities Civil Rights Act, and a failure to accommodate claim under the ADA.

Presently before the Court is the Defendant's Motion for Summary Judgment, filed on March 25, 2024.  Plaintiff filed a Response on April 15, 2024,

---

[1] In her Complaint, Plaintiff appeared to allege a disparate treatment claim under Title VII; however, in her response brief, she indicates that she is not bringing a claim for disparate treatment, but rather a claim for hostile work environment under Title VII.

and Defendant filed a Reply on April 22, 2024.  Upon review of the parties'
submissions, the Court concludes oral argument will not aid in the disposition of
this matter.  Accordingly, the Court will resolve the Defendant's present motion on
the briefs.  See E.D. Mich. L.R. 7.1(f)(2).  For the reasons that follow, the Court
grants in part and denies in part Defendant's Motion for Summary Judgment.
Specifically, Plaintiff has presented sufficient evidence to demonstrate material
questions of fact exist for the jury's determination as to her ADA, Rehabilitation
Act and PWDCRA claims.  Her claims under Title VII and the ELCRA fail to
survive Rule 56 scrutiny and will be dismissed.

## II.    FACTUAL BACKGROUND

Plaintiff Marquita Stanton is a former employee of the City of Detroit's
Office of the Chief Investigator ("OCI"), which serves as the investigative agency
for the Board of Police Commissioners ("BOPC").  Plaintiff began her
employment as an Investigator on June 9, 2012.  Her job duties included
investigating police misconduct charges for the City's police department.  Upon
receiving a case to investigate, Plaintiff conducted interviews with victims, police
officers, and other witnesses; evaluated documentation and other forms of evidence
of the alleged misconduct; drafted and submitted reports to her supervisors; and
maintained data on her cases.

When Plaintiff first started her employment with OCI, Lawrence Akbar was her immediate supervisor.  Plaintiff testified that initially, her caseload consisted of about 15 cases at a time on a rolling basis.  She further testified that her initial working relationship with Akbar was great.  She stated that at some point, Akbar became "hot and cold."  She further testified that she is not sure why he became this way, but the behavior was towards everyone.  She also testified that by 2020, Akbar started being nice towards everyone as he was trying to become the Chief Investigator.

In March of 2020, the Michigan Governor issued stay-at-home orders due to the COVID-19 pandemic.  The OCI, like every City department, was ordered to work from home in compliance with the Governor's stay-at-home orders.  Additionally, the City entered its employees into the State's Workshare Program.  Employees enrolled in the program were purportedly not allowed to work over thirty-two hours per week because their remaining eight hours were being compensated with unemployment funds from the government.  Plaintiff claims that in practice, her colleagues were informally and consistently allowed to work additional time beyond the 32-hour work week.  She also claims that she was the only investigator who had to request prior authorization to be in the building in the evenings or on the weekends.

At the time the workshare program was implemented, Plaintiff's supervisor was Lisonya Sloan.  Plaintiff testified that her relationship with Sloan was excellent.  Sloan prepared a performance evaluation for Plaintiff where she scored Plaintiff "above average," but noted Plaintiff needed to be timelier with her investigations.

In July of 2020, Interim Chief Investigator Lawrence Akbar ordered Plaintiff to return to the office because she had overdue cases.  Akbar had warned all the staff that if they fell behind on their cases, they would not be allowed to take advantage of the work-from-home program.  Plaintiff testified that she was not the only employee who was ordered to return to the office.

Upon her return, Akbar also transferred Plaintiff to the supervision of Ainsley Cromwell.  Plaintiff asserts that she was transferred, in part, because she had rejected Mr. Akbar's sexual advances and harassment.  On at least one occasion, Mr. Akbar approached Plaintiff from behind, placed his hands on Plaintiff's shoulders and began rubbing them in front of her colleagues.  Moreover, on another occasion, Mr. Akbar commented about how he was sexually attracted to Plaintiff to one of her colleagues.  And yet during another occasion, Mr. Akbar claimed work needed to be done with Plaintiff out of the office but used this as an excuse to lead Plaintiff to his home during the workday.   All of these incidents occurred before 2020.

Plaintiff testified that her working relationship with Cromwell was not good. Plaintiff testified that things took a turn when she completed "a whole bunch of cases" in preparation for her vacation. Plaintiff testified that it appeared that Cromwell changed after he approved her two-week vacation. Plaintiff explained that she and Cromwell began to disagree about policy and findings in cases. Plaintiff believed these disagreements resulted in Cromwell's attitude toward her.

In the late summer or early fall of 2020, Plaintiff informed Mr. Cromwell about her disability. Plaintiff suffers from ADHD and major depressive disorder.

In July of 2020, Plaintiff filed a union grievance against Mr. Cromwell and Mr. Akbar for adverse treatment, stemming from the determination that Plaintiff was ineligible for pandemic telework. On July 13, 2020, Mr. Akbar issued Plaintiff with a written reprimand for poor work performance.

In the fall of 2020, Plaintiff turned in one of her cases to Cromwell but mistakenly kept a copy of her notes with different color highlighters used throughout the document. At this point, Plaintiff explained that she suffers from ADHD and her use of the different color highlighters helped her to stay focused. In response, Cromwell kept repeating that doing this "was not necessary." Later that day, Plaintiff overheard Cromwell talking about how she resolves cases with another investigator at the office. He was mocking and belittling Plaintiff in front of her colleague, who later told Plaintiff what Cromwell said.

By November of 2020, Plaintiff notified Mr. Cromwell that OCI's changes to Plaintiff's work hours were negatively impacting her productivity and that she intended to seek an ADA accommodation.  On December 1, 2020, Mr. Cromwell responded that: "You may make an ADA request . . . Deadlines for assignment completion continue to remain in effect.  Failure to adhere to assignment deadlines and work responsibilities shall result in appropriate disciplinary action." Mr. Cromwell further explained that due to the workshare program, all investigators were only allowed to work thirty-two hours per week. Later that day, Plaintiff emailed Mr. Cromwell and stated that due to the new time restrictions, she was now "requesting to explore appropriate ADA accommodations with the appropriate personnel" to assist her with maintaining "OCI's expected level of productivity and in compiling and providing physical OCI case files to the office, particularly non-business hours."

Plaintiff testified that Cromwell was intent on slowing her down to make her look bad.  Cromwell would allow other investigators to stay in the building past 5:30 p.m., however Plaintiff was not allowed to do this.  Moreover, Cromwell would take his time turning in her cases to the Chief Investigator, who reviewed the cases and officially closed them.  Thus, because Cromwell would hold onto her cases for too long, they were not officially closed in a timely manner.

In December of 2020, Plaintiff sent an email to DPD Human Resources and began to engage in the ADA interactive process.  As a result of that process, Plaintiff, on December 17, 2020, visited her physician and received a letter from her physician regarding her diagnosis and needs. Plaintiff gave the letter to Human Resources.   Plaintiff's physician advised that: "Marquita has Adult Attention Deficit Hyperactivity Disorder, a neurobiological disorder that typically requires her to take more time to complete complex cognitive tasks, such as reading comprehension, writing letters and reports, concentrating, remembering and verbal communication."  ECF No. 25, PageID.286.  Plaintiff's doctor further advised that, "[a]s a result of Marquita's diagnosis, she warrants accommodations from the City of Detroit.  Her primary duty-related ADHD symptoms include: working memory and work finding deficits, visual and auditory distractibility/sensory overload, prioritizing (racing) thoughts, over-focusing and recalling verbal instructions." *Id.*

After two months, Plaintiff had still not been offered any accommodations from OCI.  Plaintiff commenced FMLA leave on February 8, 2021 through April 11, 2021.  During her FMLA leave, the City's HR Department asked Plaintiff to complete forms related to her ADA accommodation request.  After she submitted the forms, she was informed that the interactive process would be suspended until she returned to duty.

On March 20, 2021, Plaintiff made a formal complaint to the City's Office of Civil Rights, Inclusion and Opportunity (CRIO) alleging gender-based harassment and disability harassment against Mr. Cromwell. On May 4, 2021, Plaintiff had an initial intake interview with CRIO.  On October 28, 2021, Plaintiff was interviewed again.  On December 20, 2021, Cromwell was interviewed.  After its investigation, CRIO concluded that Plaintiff's complaint was not substantiated.

On April 20, 2021, the City's HR Department sent email correspondence to Plaintiff concerning her ADA request for accommodation.  It read: "Employee Stanton will be allowed to work in the current work location Monday thru Friday until 5:30 p.m. daily." She was also permitted to complete assignments at home on Saturdays and Sunday if needed. Plaintiff was not happy with the accommodation offered and responded that the requirement that Plaintiff leave by 5:30 p.m. was a restriction, rather than an accommodation.

On May 3, 2021, the City's HR Department posted the position of Senior Police Commission Investigator.  Plaintiff applied for the open position.  On June 3, 2021, Plaintiff was interviewed for the open position by the same supervisors she had reported for harassment and misconduct.  The supervisors then made recommendations to the BOPC, who voted on the applicants.  In September of 2021, Plaintiff was denied the position of Senior Police Commission Investigator.

Instead, an employee with less experience, less seniority, and fewer case closures than Plaintiff was awarded the position.

On October 11, 2021, Plaintiff's new supervisor, Rosalia Madrigal, sent an email to Plaintiff regarding her past due cases. The email also outlined an action plan to get Plaintiff up-to-date with her cases. Madrigal noted that this plan was amended as Plaintiff stated that the initial September plan was not feasible. On January 27, 2022, Madrigal again emailed Plaintiff regarding her caseload. This time Madrigal requested an update on Plaintiff's incomplete 2020 cases and her 2021 cases. Madrigal also informed Plaintiff that starting in February, investigators would be required to complete 10 cases per month. Plaintiff responded that: "In light of my previously established need for an ADA accommodation, 10 cases/month is an unattainable goal for me to accomplish in a 20-day work month."

On March 7, 2022, Mr. Akbar invited all the investigators to participate in an OCI Backlog Reduction Program. This was a voluntary overtime opportunity. Plaintiff was approved to be a part of the program for one week. Defendant asserts that because Plaintiff failed to close a sufficient number of cases, she was removed from the program.

In April of 2022, Plaintiff sent email correspondence to her supervisors which included charts of all of OCI's investigators' productivity from July of 2021

through December of 2021. Plaintiff pointed out that no investigators had averaged 10 case closures per month. Thus, Plaintiff inquired why she was being asked to close that many cases per month. Conversely, Defendant maintains that from April 12, 2021 through October 8, 2021, Plaintiff only closed 29 cases, which consisted of her only closing two cases for July and one case for September.

Plaintiff filed an initial complaint with the EEOC in April of 2021. After over a year without any response, Plaintiff submitted an updated complaint with the EEOC on March 16, 2022. The EEOC filed a charge of discrimination against Defendant, but no other known action was taken on the case. Facing increasing hostility at work, Plaintiff requested a right to sue letter and was constructively terminated in July of 2022.

## III.   LAW & ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B.  Exhaustion of Administrative Remedies

Defendant first argues that Plaintiff's Title VII claim should be dismissed because she failed to allege any Title VII claims in her EEOC charge, rather she only alleged discrimination based on her disability.  Defendant also argues that Plaintiff was required to file her EEOC charge within 300 days from the alleged unlawful acts.  Because Plaintiff testified that Mr. Akbar's sexual actions ceased prior to 2020, her EEOC charge was not timely filed because she did not file it until April of 2021.

To have an actionable Title VII claim, a plaintiff must first file a timely administrative charge with the EEOC.  *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).  A plaintiff has 300 days from the alleged unlawful acts to file a charge of discrimination for purposes of Title VII.  *Hill v. Oak St. Health MSO LLC*, No. CV 22-10684, 2023 WL 4206065, at *3 (E.D. Mich. Jun. 27, 2023).

Here, while Plaintiff's lawsuit alleges a Title VII claim, nowhere in her EEOC charge does she mention any type of discrimination or retaliation as described under Title VII of the Civil Rights Act. Moreover, Plaintiff testified that Mr. Akbar's sexual advances ceased before 2020. Thus, Plaintiff's EEOC was untimely because it was filed more than 300 days from the date of Mr. Akbar's last unlawful act.

Plaintiff argues that Defendant failed to timely raise the affirmative defense of failure to exhaust. She relies on the Supreme Court's decision in *Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843 (2019). However, the decision in *Fort Bend* is distinguishable from the facts present here. In *Fort Bend*, the first time the county raised its failure to exhaust administrative remedies argument was on remand, which was years after litigation had commenced. *Id.* at 1848. Here, Defendant raised the argument first in its affirmative defenses and next in its Motion for Summary Judgment. Therefore, Defendant's affirmative defense of failure to exhaust administrative remedies is not untimely.

For these reasons, Plaintiff's Title VII claim is dismissed for failure to exhaust administrative remedies.

## C.  ADA, Rehabilitation Act and PWDCRA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Plaintiff also

brings a claim under Section 504 of the Rehabilitation Act and the Michigan

PWDCRA.  Generally, claims under Title II of the ADA and the Rehabilitation Act

are analyzed together because the language of the two statutes materially differs in

only two ways.  *See, e.g., Knox Cnty., Tennessee M.Q*., 62 F.4th 978, 1000 (6th

Cir. 2023); *S.S. v. E. Kentucky Univ*., 532 F.3d 445, 452-53 (6th Cir. 2008).  First,

the Rehabilitation Act applies only to federally funded, rather than "public"

entities.  *Id*. at 452.  Defendant does not contest that it meets this classification.

Second, the Rehabilitation Act requires that discrimination occur "solely by reason

of" the plaintiff's disability, whereas the ADA requires that it occur "because of"

the plaintiff's disability. *Lewis v. Humboldt Acquisition Corp*., 681 F.3d 312, 315

(6th Cir. 2012) (en banc)(quoting 29 U.S.C. § 794(a) & 42 U.S.C. § 12112(a)).

Therefore, the Court will analyze her ADA and Rehabilitation Act claims together.

The Michigan PWDCRA similarly "substantially mirrors" the ADA, and these

claims are "generally analyzed identically."  *Hrdlicka v. Gen. Motors, LLC*, 63

F.4th 555, 566 (6th Cir. 2023) (citations omitted). As such, if Defendant is entitled

to summary judgment on the ADA claim, then it is also entitled to summary

judgment on the Rehabilitation Act and Michigan PWDCRA claims.

When a plaintiff does not have direct evidence she can make a prima facie showing of discrimination with circumstantial evidence by demonstrating that 1) she is an individual with a disability within the meaning of the ADA; 2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) she suffered an adverse employment decision because of her disability.  *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

Here, Defendant does not argue whether Plaintiff has a disability within the meaning of the Act.  Rather, Defendant argues Plaintiff was not "otherwise qualified" to perform the essential functions of her job and she cannot show she suffered an adverse employment action because of her disability.

As an initial matter, Plaintiff has come forward with evidence that she suffers from a disability within the meaning of the ADA.  "The definition of disability" under the ADA "shall be construed in favor of broad coverage."  42 U.S.C. § 12102(4)(A).  The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Major life activities include, but are not limited to, reading, concentrating, thinking, and communicating.  42 U.S.C. § 12102(2)(A).  Here, Plaintiff has ADHD which substantially limits the major life activities of reading, concentrating, thinking, and communicating.  *See Ugactz v. United Parcel Serv*.,

14

No. 10-cv-1247, 2013 U.S. Dist. LEXIS 43481, *7-8 (E.D.N.Y. Mar. 26, 2013)(finding that ADHD and major depression qualify as mental impairments which substantially limit the major life activities of thinking, concentrating, and sleeping).

A person is considered "otherwise qualified" for a position if he can perform the essential functions of the job in question, with or without reasonable accommodations.  42 U.S.C. § 12111(8).  A function is essential if "(1)  the position exists to perform the function, (2) a limited number of employees are available who can perform it, or (3) it is highly specialized." *Backhaus v. Gen. Motors LLC*, 54 F. Supp.3d 741, 748-49 (E.D. Mich. 2014).

In this case, Plaintiff's essential job functions were to investigate, complete, and close cases.  She was required to close cases within 90 days, and by February of 2022, she was required to close 10 cases per month.  However, Plaintiff did not close ten cases a month and struggled to complete 4 to 5 cases per month.

Plaintiff maintains that she was meeting the legitimate employment expectations of her employer.  She directs the Court to a chart she prepared.  The chart relates to case closures for the OCI staff from July 2021 through December of 2021.  Plaintiff's chart reveals that no investigator closed 10 cases per month. Defendant argues this chart is irrelevant because the requirement to close 10 cases a month was not in effect until February of 2022.  Moreover, Defendant maintains

that Plaintiff's supervisor, Madigral, had set a plan of action to get Plaintiff up-to-date with her caseload.  This was a plan created in 2022 specifically for Plaintiff, as she still had incomplete cases dating back to 2020 and 2021.  In October of 2021, Plaintiff had 11 backlogged cases from 2020 and 2021.  From April 12, 2021 through October 8, 2021, Plaintiff only closed 29 cases, which consisted of her closing 2 cases for July and 1 case for September.  During those six months, Plaintiff had not been completing at least five cases per month.

The Court concludes there is a question of material fact concerning whether Plaintiff was otherwise qualified to perform the essential functions of her job. While Defendant maintains Plaintiff's chart is irrelevant, the chart does tend to show that Plaintiff's case closure rate was commensurate with her peers.  While Plaintiff may not have closed as many cases as Defendant required, it appears her colleagues were similarly not meeting Defendant's productivity requirements because they were closing cases at the same rate as the Plaintiff.  Additionally, the fact the OCI created the backlog reduction program to address the past due cases suggests it was not only the Plaintiff who did not close a sufficient number of cases per month.  OCI would not have invited all of the investigators to join the program if it were only Plaintiff's cases that were past due.  As such, Plaintiff has come forward with sufficient evidence for this issue to be submitted to the jury.

Defendant further argues that Plaintiff cannot show that she suffered an adverse employment action because of her disability.  Contrary to Defendant's argument, Plaintiff has come forward with evidence of an adverse employment action.  First, Plaintiff was denied the Senior Investigator promotion and the individual who got the job was less qualified than the Plaintiff.  The person that got the promotion had less seniority and less experience as an investigator overall.  Moreover, this individual closed fewer cases than the Plaintiff both before and after the overtime program was implemented.  Next, Plaintiff asserts she was denied the opportunity to participate in the overtime program.  Defendant maintains she was not permitted to participate because her case closures were too low. However, Plaintiff has brought forth evidence that Plaintiff was closing cases at a rate commensurate with her peers in the OCI office.

Finally, while Defendant claims it had a legitimate, non-discriminatory reason for its adverse employment actions, Plaintiff has come forward with sufficient evidence to create a question of fact as to whether Defendant's reason was really pretext for discrimination.  Defendant relies on its argument that Plaintiff was not closing cases within 90 days and could not close 10 cases per month.  However, Plaintiff's evidence tends to show that she was closing cases at a rate commensurate with her peers.  Accordingly, Defendant is not entitled to

summary judgment on Plaintiff's disability discrimination claims under the ADA, the Rehabilitation Act and the PWDCRA.

### D. ADA – Failure to Accommodate

Under the ADA, discrimination includes a failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.  42 U.S.C. § 12112(b)(5)(A).  To establish a prima facie failure-to-accommodate claim, a plaintiff must show that (1) she was disabled within the meaning of the ADA; (2)  she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4)  she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.  *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016).  Once an ADA plaintiff establishes that an employer failed to accommodate a known disability, the employer bears the burden "of proving that . . . a proposed accommodation will impose an undue hardship upon the employer."  *Id*.

Here, there is a question of fact concerning whether the Defendant offered Plaintiff a reasonable accommodation.  While Defendant claims it did offer Plaintiff a reasonable accommodation, Plaintiff claims the additional hour each day

and the ability to work from home on the weekends was not a reasonable accommodation, particularly when her colleagues faced no restrictions to their work hours or access to the building.   Accordingly, Defendant is not entitled to summary judgment on Plaintiff's failure to accommodate claim.

### E.  Hostile Work Environment under the ELCRA[2]

To establish a prima facie case of sexual harassment based on a hostile work environment, plaintiff must show that (1) she was a member of a protected class, (2)  she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive, and (5)  there is a basis for employer liability.  *Wasek v. Arrow Energy Servs*., 682 F.3d 463, 468 (6th Cir. 2012).  Plaintiff argues she was subjected to unwelcome sexual advances, and other conduct of a sexual nature and that she reported the action and the Defendant failed to act on it.

Plaintiff has failed to demonstrate that the harassment unreasonably interfered with her work performance.  On summary judgment, the Court looks to the totality of the alleged sex-based harassment to determine whether it was "sufficiently severe or pervasive to alter the conditions of [a plaintiff's] employment and create an abusive working environment." *Williams v. CSX*

---

[2] Plaintiff concedes that she is not bringing a disparate treatment claim under the ELCRA.

*Transp. Co., Inc.*, 643 F.3d 502, 512 (6th Cir. 2011). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In contrast, "sexual comments and harassing acts of a continual nature are more likely to be deemed pervasive." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008).

In this case, Plaintiff claims Mr. Akbar touched her shoulders on one occasion, made isolated comments about her, and tried to lure her from the office to his home on another occasion. These isolated acts are not enough to demonstrate that the harassment was so severe and pervasive that it altered the terms of Plaintiff's employment. In any event, Plaintiff was required to report the sexual harassment allegations to a supervisor, which she admitted during her deposition she did not do. She cannot rely on her March 2021 CRIO complaint because she does not mention Mr. Akbar in the complaint. Thus, in addition to the fourth element of her hostile work environment claim, she also cannot establish the fifth element, or that there is a basis for employer liability.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, Defendant's Motion for Summary Judgment [#25] is GRANTED IN PART and DENIED IN PART. Counts IV and V are DISMISSED.

SO ORDERED.

Dated:  August 8, 2024                    /s/Gershwin A. Drain
                                          GERSHWIN A. DRAIN
                                          United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 8, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager